# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| JULIA "JD" JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: |
| | ) |
| SCIENCE APPLICATIONS | ) **JURY DEMANDED** |
| INTERNATIONAL | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

**COMES NOW** Plaintiff, Julia "JD" Jones ("Plaintiff" or "Jones"), by and through her undersigned counsel of record, and files this Complaint against Defendant, Science Applications International Corporation ("Defendant" or "SAIC"). As grounds for this Complaint, Plaintiff states the following:

## INTRODUCTION

1. This suit is authorized and brought to secure protection of and to redress the deprivation of rights secured by the False Claims Act ("FCA"), codified at 31 U.S.C. § 3729 et seq., when Plaintiff reported what she identified as Defendant's fraudulent billing practices and Defendant terminated Plaintiff's employment in retaliation, which violated 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

2. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3730(h)(2), and 31 U.S.C. § 3732(a).

3. The unlawful practices described herein were committed in Huntsville, Alabama. Huntsville is located in Madison County, Alabama, and, accordingly, venue lies in the United States District Court for the Northern District of Alabama, Northeastern Division, pursuant to 28 U.S.C. § 1391(b), 31 U.S.C. § 3730(h)(2), and 31 U.S.C. § 3732(a).

## PARTIES

4. Jones is a citizen of the United States of America, over the age of nineteen (19) years, a resident of the State of Alabama, and was at all times relevant an "employee" of Defendant.

5. Defendant is a foreign corporation functioning within the State of Alabama and was at all times relevant Plaintiff's "employer."

## FACTS

6. Plaintiff re-alleges and incorporates paragraphs one (1) through five (5) as if fully set forth herein.

7. Defendant received projects when a government entity entered into an agreement with the Army's Software Engineering Directorate ("SED") for specialized services.

8. SED then entered into agreements with Defendant to provide individuals to execute those services.

9. Defendant supplied both direct employees and subcontractors to provide the specialized services.

10. The U.S. government then paid Defendant's full hourly rate for direct employees.

11. The U.S. government reimbursed Defendant ninety-five dollars ($95) per hour for subcontractors.

12. The hours an individual was authorized to work on a project(s), the work description, and Work Authorization Document ("WAD") were provided via Defendant's web applications.

13. The individuals working on the project(s) then recorded their hours.

14. On December 22, 2014, Defendant hired Jones as a Lead Software Engineer.

15. Defendant later changed Jones' title to Principal Engineer Software Embedded.

16. Jones programmed using numerous languages, performed requirements analysis and definition, wrote source code, and designed, implemented, and tested software.

17. On November 13, 2017, Jones transferred to the Flight Mission Simulator Digital Program ("FMS/D") project group.

18. Jones initially worked under Project Hiring Manager, Andrew Schmitt ("Schmitt").

19. However, Schmitt was previously promoted to supervisor of FMS/D and thus was no longer on-site shortly after Jones' transfer.

20. Derek "Austin" Harkins ("Harkins") became Jones' technical manager.

21. Tina Clark ("Clark") became Jones' service line manager.

22. Thereafter, Jones asked Harkins which project ID she should bill to when working on a specific software product for a particular entity.

23. Harkins replied that "It's all one big pot of money, use whichever number expires first."

24.     At that time, there were approximately three (3) different entities contracting with and paying for Defendant's FMS/D services.

25.     A single customer could supply multiple projects to FMS/D.

26.     However, the "pot of money" was only supposed to be spent on the project specified by the entity.

27.     Thus, Defendant did not bill to the correct entity and/or project.

28.     Defendant also mandated that FMS/D use "common files."[1]

29.     Defendant used common files to disguise what work was being done for which entity.

30.     Using common files allowed the task to be charged to whichever project was expiring or available.

31.     Defendant specifically used common files for two (2) entities: one (1) unclassified entity and one (1) classified entity.

32.     This required that Defendant move the unclassified files to classified, without a change in the classification designation.

---

[1] "Common files" are a separated offset of files called "parameters."

33. The issues within the classified project required the use of common files, but the unclassified project did not require the use of common files.

34. Defendant never told Jones the reason for this mandate.

35. Harkins also required that programmers put a specific header, called a "flower box," above the beginning of each new or modified function implementation.

36. Flower boxes took time to create, frequently caused additional problems, and took an extensive amount of time to resolve.

37. The use of flower boxes forced the project group to spend more hours than necessary to resolve the newly created issues.

38. Defendant then billed for the additional hours it took to fix the problems Defendant created.

39. On or about March 2, 2018, during an FMS/D group meeting, Harkins and Brian Brandt ("Brandt") informed the group that all hours for a specific quote needed to be used by the project deadline of October 5, 2018.

40. Harkins and Brandt stated the hours had to be "burned soon because there was a lot of attention being paid to those project hours."

41. However, the date provided during the meeting was earlier than the deadline recorded in Defendant's system.

42. This accelerated the use of all hours for the project.

43. Jones expressed to Harkins concerns regarding various unethical practices, including practices that resulted in fraudulent overbilling.

44. Harkins retorted that he "[did not] care if [they] are making problems or solving problems, this [did] not change [his] budget one bit."

45. Therefore, beginning in or about March of 2018, Jones began warning Defendant of unethical practices that resulted in overbilling the U.S. government.

46. Jones informed Project Manager, Tom Hancock ("Hancock"), who was outside her line of command, about Harkins' comments regarding billing.

47. After Harkins' response, Jones then put a "flag" up in Defendant's job system.

48. The system flag indicated Jones was actively searching for another SAIC position.

49. Defendant then hired Brandt as the new Project Manager.

50. On April 4, 2018, Jones attempted to explain the unethical practices to Brandt.

51. Brandt responded, "You're about this close to being fired."

52. On April 9, 2018, Jones contacted Human Resource ("HR") Business Partner, JamiLee Beddingfield ("Beddingfield") to report Defendant's fraudulent billing practices.

53. Per Beddingfield's request, Jones supplied a written list of issues that resulted in overbilling.

54. On April 10, 2018, Jones again opposed Defendant's fraudulent billing practices when Jones reported them to Marcy Rich ("Rich"), the supervisor three (3) management levels above her.

55. During Jones' conversation with Rich, Beddingfield was also on the telephone.

56. Rich's only response to Jones' report was that the fraudulent billing practices were not unethical.

57. Rich then accused Jones of insubordination.

58. However, Jones was never insubordinate.

59. Less than one (1) week later, on April 13, 2018, Schmitt called Jones to tell her that she would be escorted off the base the following Monday morning.

60. On April 16, 2018, approximately one (1) week after Jones reported Harkins' comments and contacted Beddingfield and Rich, Jones was removed from the project.

61. After informing Defendant of the fraudulent billing practices, Jones was accused of misreporting her time.

62. However, Jones had never misreported her time.

63. During this period, Jones applied to various positions for which she was qualified.

64. However, Defendant prevented Jones from finding another position.

65. Upon applying, Defendant subsequently removed the job position, did not consider Jones, or ignored her request.

66. Jones applied for a position in Maryland and met with the hiring manager.

67. The hiring manager indicated Jones would be selected for the position.

68. Only four (4) hours later, the hiring manager stated he could not offer Jones the position because she was not "in love" with the Java software language.

69. Although Java was not Jones' preferred software language, she was not opposed to using Java and previously expressed her willingness to assist others in learning Java.

70. Jones thereafter applied to several other positions in Huntsville, Alabama, but was not interviewed.

71. Jones also applied for two (2) additional positions: a level three (3) and a level four (4) position.

72. On April 23, 2018, Schmitt told Jones that accepting a level three (3) position would result in a twenty-three thousand dollar ($23,000) cut in pay.

73. However, only six (6) months prior, Jones had worked as a level three (3) and her pay was only six thousand dollars ($6,000) less than her current pay.

74. Schmitt stated this was a "regulation," but then changed it to a "policy."

75. Jones searched Defendant's policies and did not find this information.

76. Schmitt requested HR send the information to Jones.

77. However, upon receipt of the information, Jones discovered it only applied to "new hires" and was therefore inapplicable.

78. Jones requested her application be canceled for the level three (3) position.

79. However, instead of canceling Jones' level three (3) application, her application for the level four (4) position was canceled.

80. Jones discovered the level four (4) position was listed in the spreadsheet as a level three (3) position and again requested to be considered for the level four (4) position.

81. Less than twenty-four (24) hours after applying, Jones was informed the group had lost funding and the positions had been canceled.

82. The positions nonetheless remained open in Defendant's system.

83. Jones was not considered for the positions.

84. On May 3, 2018, Jones once again met with Beddingfield to oppose Defendant's fraudulent billing practices and report the subsequent retaliation.

85. Beddingfield refused to address the issues raised by Jones and avoided directly responding to Jones' complaints.

86. When Beddingfield did acknowledge Jones' complaints, Beddingfield only noted that Jones' concerns had been expressed.

87. Beddingfield then stated, "We're not making any changes, you know."

88. Beddingfield further stated "the VPP of the program is saying, you know, this is what we're going to do."

11

89. When Jones reiterated Defendant's fraudulent billing practices were illegal, Beddingfield stated, "They're not illegal. . . .I am not getting into that."

90. Jones then expressed her understanding that HR professionals must defend their company.

91. Beddingfield retorted, "I'm not going down for this company! I can promise you that!"

92. Beddingfield also commended Jones for doing her "ethical part" and raising concerns about fraudulent billing.

93. Jones then informed Beddingfield that she was being retaliated against for reporting fraudulent billing.

94. Beddingfield replied, "Well no, let's not go that way. So, at what point is it dropped?"

95. Defendant continued to ignore Jones' complaints regarding fraudulent billing and retaliation.

96. On May 30, 2018, less than one (1) month after Jones met with Beddingfield in person, Defendant terminated Jones' employment.

97. During Jones' tenure with FMS/D, Defendant never had to discipline Jones.

98. Defendant's stated reason for terminating Jones was that she was unhappy in her current work position and was unable to find another qualified position within SAIC.

99. Contrary to Defendant's stated reasons, there were positions for which Jones was qualified.

100. Defendant prevented Jones from applying and/or interviewing for open positions.

101. Less than one (1) week prior to her termination, Jones' account for Defendant's job availability and application database was deleted.

102. Defendant never restored Jones' account.

103. Jones was also willing and able to continue performing her current job duties.

104. Therefore, Jones was terminated in retaliation for opposing Defendant's fraudulent billing practices.

## COUNT I
## RETALIATION IN VIOLATION OF
## THE FALSE CLAIMS ACT

105. Jones opposed what she believed to be Defendant's fraudulent billing practices.

106. Jones specifically reported what she believed to be fraudulent billing practices to Andrew Schmitt, Austin Harkins, Brian Brandt, Marcy Rich, and JamiLee Beddingfield.

107. Jones also informed HR that she was being retaliated against as a result of reporting what she believed to be fraudulent billing practices.

108. As a result of Jones' complaints, Defendant falsely accused Jones of misreporting her time.

109. Approximately one (1) week after reporting Harkins' statements regarding fraudulent billing practices,[2] explaining unethical practices to Brandt, and meeting with both Rich and Beddingfield, Defendant removed Jones from her project.

110. When Jones attempted to transfer to another SAIC position, Defendant removed the position(s) after she applied, failed to consider her for the position(s), or ignored her request(s).

111. On May 30, 2018, less than one (1) month after Jones met with Beddingfield in person, Defendant terminated Jones' employment.

---

[2] Harkins stated, "It's all one big pot of money, use whichever number expires first." Harkins told the programmers to add "flower boxes." Harkins provided the wrong date for the end of a project, thus accelerating the use of all hours and stated that the hours had to be "burned soon because there was a lot of attention being paid to those project hours." Harkins stated that he "[did not] care if [they] are making problems or solving problems, this [did] not change [his] budget one bit."

14

112. While employed in FMS/D, Defendant never had to discipline Jones.

113. Defendant's stated reason for Jones' termination was that she was unhappy in her current work position and was unable to find another qualified SAIC position.

114. Contrary to Defendant's stated reasons, there were positions for which Jones was qualified.

115. Defendant prevented Jones from applying and/or interviewing for open positions.

116. Less than one (1) week prior to Jones' termination, her account for Defendant's job availability and application database was deleted.

117. Defendant never restored Jones' account.

118. Jones was also willing and able to continue performing her current job duties.

119. Defendant terminated Jones' employment in retaliation for opposing and reporting Defendant's fraudulent billing practices.

**WHEREFORE**, Plaintiff respectfully requests this Court grant to Plaintiff the following:

A. Reinstatement with the same seniority status Plaintiff would have had but for the retaliation, or front pay if the Court finds reinstatement to be impracticable;

B. Two (2) times the amount of back pay for lost income and any other compensatory damages;

C. A reasonable attorneys' fee;

D. Plaintiff's costs and expenses;

E. Interest on all monies owed; and

F. Any other relief the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 23rd day of September 2019.

/s/ Anthony D. Michel
Anthony D. Michel (ASB-6809-064M)
*Attorney for Plaintiff, Julia "JD" Jones*

**WRADY MICHEL & KING**
505 20th Street North, Suite 1650
Birmingham, AL 35203
Telephone: (205) 980-5700
Facsimile: (205) 994-2819
anthony@wmalabamalaw.com

## JURY DEMAND

Plaintiff demands a trial by struck jury.

Respectfully submitted,

/s/
Attorney for Plaintiff

16

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL AT THE FOLLOWING ADDRESS:**

Science Applications International Corporation
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104